UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DR. JEFFERY STYNOWICK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:06CV01245 RWS |
| ) | |
| THE UNITED STATES LIFE INSURANCE ) | |
| COMPANY IN THE CITY OF NEW YORK, ) | |
| et al., ) | |
| Defendant(s). ) | |

## **MEMORANDUM AND ORDER**

This matter is before me on Defendant The United States Life Insurance Company in the City of New York's Motion for Partial Summary Judgment [#23].

Defendant The United States Life Insurance Company in the City of New York ("U.S. Life") moves for summary judgment as to Count II of Plaintiff Dr. Jeffery Stynowick's complaint. Count II alleges that under section 375.420 of the Revised Statutes of Missouri, U.S. Life vexatiously refused to pay Dr. Stynowick's disability insurance claim. U.S. Life argues that it had reasonable cause to deny Dr. Stynowick's disability and that no evidence exists to prove that U.S. Life was vexatious or recalcitrant.

Because I find that material facts remain in dispute, I will deny U.S. Life's Motion for Partial Summary Judgment.

## **Background**

The undisputed facts of this case are as follows:

In January 2005, Plaintiff Dr. Jeffery Stynowick made a claim for total disability benefits under a long-term disability insurance policy that Defendant The United States Life Insurance Company in the City of New York ("U.S. Life") issued to him through Defendant AMA

Insurance Agency, Inc. ("AMAIA"). The condition Dr. Stynowick claims to be causing his disability is progressive muscle loss and weakness, which began in the late 1990s and ultimately resulted in his alleged inability to ambulate or stand unassisted for any significant period of time. On the insurance claim form that Dr. Stynowick submitted to Disability RMS, U.S. Life's third-party claims administrator, Dr. Stynowick identified his date of total disability as June 20, 2003. He also identified the date on which he was first treated for his disability as January 20, 2003.

According to Dr. Stynowick's Certificate of Insurance and Certificate Rider, In order to be considered "totally disabled" under Dr. Stynowick's disability insurance policy, Dr. Stynowick was required to establish the following:

(a) a complete inability to perform the substantial and material duties of his Current Occupation; and
(b) that he was being treated by a physician to the extent necessary under existing standards of medical practice for the condition causing disability.

By a letter dated August 16, 2005, Disability RMS denied Dr. Stynowick's disability claim based in part on the fact that "it [did] not appear as if [Dr. Stynowick was] under the regular care of a physician as [his] last date of treatment prior to the June 20, 2003 date was March 31, 2003 and then treatment was not sought again until January 4, 2005." Dr. Stynowick subsequently abandoned his disability claim of June 20, 2005.

Dr. Stynowick made a new claim for disability with a disability date of December 5, 2004. The condition from which Dr. Stynowick claims total disability is muscle loss and weakness in his left leg resulting in an alleged inability to ambulate or stand unassisted for any significant period of time. Dr. Stynowick claims that the physician who was treating his disabling condition was an orthopedic surgeon by the name of Fall Maylack, M.D. Dr. Stynowick first presented to Dr. Maylack on January 20, 2003. One of Dr. Stynowick's complaints at this visit was of "exquisite pain in the left leg." Based on x-ray results and an

2

examination, Dr. Maylack diagnosed Dr. Stynowick with "advanced degenerative joint disease of the left hip" and recommended that Dr. Stynowick undergo surgery for total left hip replacement. On February 3, 2003, Dr. Stynowick underwent a total left hip replacement surgery.

At the first post-operative appointment on February 24, 2003, Dr. Maylack reported that Dr. Stynowick's hip was "doing quite well with good wound healing, motion, and function" and recommended a follow-up appointment in six to eight weeks time to assess Dr. Stynowick's progress. Dr. Maylack's physician notes from the February 24, 2003 appointment do not mention the specific term "left lower leg atrophy or weakness."

On March 5, 2003, Dr. Stynowick returned to Dr. Maylack's office and reported that his hip was "doing great but [sic] jammed his right thumb." Dr. Maylack's physician notes from the March 5, 2003 appointment make no reference to any treatment being provided by Dr. Maylack to Dr. Stynowick for left lower leg atrophy or weakness. On March 31, 2003, Dr. Stynowick returned to Dr. Maylack's office and reported that his hip was "doing great." At that time, Dr. Maylack recommended that Dr. Stynowick "continue advancement to full activities" and asked Dr. Stynowick to "follow up for [sic] exam and x-ray of the left hip in six months time." Dr. Maylack's physician notes of March 31, 2003 make no mention of Dr. Stynowick having or complaining about left lower leg atrophy or weakness. The notes also make no reference to any treatment being provided by Dr. Maylack to Dr. Stynowick for left lower leg atrophy or weakness.

Dr. Stynowick did not return to see Dr. Maylack until January 4, 2005, twenty-one months after the March 31, 2003 appointment. At the January 4, 2005 appointment, Dr. Stynowick complained of "progressive pain and dysfunction all over." Dr. Maylack's physician notes of January 4, 2005 do not mention the specific term "left lower leg atrophy or weakness."

After the January 4, 2005 appointment, Dr. Maylack saw Dr. Stynowick on five more occasions. The last appointment Dr. Stynowick had with Dr. Maylack was on March 2, 2007. None of Dr. Maylack's physician notes from these appointments refer to muscle loss, atrophy or weakness in Dr. Stynowick's lower left leg. The only specific use of the word "weakness" in Dr. Maylack's physician notes was on June 7, 2005, noting that Dr. Stynowick "feels he is unable to function in his capacity as a physician due to multiple weaknesses." At his deposition, Dr. Maylack testified that he does not recall the body part or parts in which Dr. Stynowick was claiming weakness during the June 7, 2005 appointment.

By a letter dated June 16, 2006, Disability RMS denied Dr. Stynowick's second disability claim. One of the reasons for denial was that Dr. Stynowick failed to meet the definition of "total disability" as set forth in the certificate of insurance. Disability RMS determined that Dr. Stynowick had not met the definition of "total disability," in part, because Dr. Stynowick was not "under the regular care and attendance of an attending physician providing observation and treatment to the extent necessary under existing standards of medical practice for the condition causing disability." Disability RMS's conclusion that Dr. Stynowick was not under the regular care of an attending physician as required by the certificate of insurance was based, in part, on the fact that:

> (a) Dr. Stynowick did not seek the care of a physician for the twenty months prior to going out of work;
> (b) none of the medical records of Dr. Stynowick's treating physician Dr. Maylack make mention of complaints of, or treatment of, atrophy, muscle loss or weakness in Dr. Stynowick's lower left leg;
> (c) none of the physicians seen by Dr. Stynowick provided Dr. Stynowick with treatments that Disability RMS's medical consultant would consider necessary under existing standards of medical practice for a person with lower leg atrophy and weakness.

The medical consultant Disability RMS relied on in analyzing Dr. Stynowick's disability claim was Dr. Alan Neuren, a physician board certified in neurology and psychiatry. Dr. Neuren

4

wrote medical review reports dated March 27, 2006 and May 22, 2006 in relation to his review of Dr. Stynowick's disability claim.

In his report dated March 27, 2006, Dr. Neuren wrote as follows:

> It would not appear that the medical care the insured received is appropriate for his reported complaints. As noted[,] there is an extended period with no medical care prior tot he insured's claiming disability. The last progress note[] from Dr. Maylack in 2003 indicated the insured was doing well. It is not credible that there would have been no care for almost two years if the insured were getting worse. Subsequent care has also been minimal. Examinations by Dr. Maylack have been minimal to non-existent.
>
> ***
>
> The only "care" provided since the insured has stopped working has been assessments to attempt to validate disability rather than to try to determine a cause for his subjective complaints and to treat it.

In his report dated May 22, 2006, Dr. Neuren wrote as follows:

> When [Dr. Stynowick was] last seen by Dr. Maylack in March of 2003[,] he reported he was doing great. When he returned in January of 2005, he again reported he was doing well, but wanted to go on disability. There continues to be no documentation of what transpired between May of 2003 and January 2005. [Medical] [r]ecords . . . fail to provide any attempt to provide a diagnosis, evaluation, or treatment for his reported complaints.

At his deposition, Dr. Neuren explained that the treatment necessary under existing standards of medical practice for a person complaining about lower leg atrophy and weakness would include, at the very least, a general history and physical, basic lab studies to determine if the condition is due to a metabolic problem, immune problem, malignancy or other illness, examinations by an internist and neurologist and skilled physical therapy. The parties dispute whether or not Dr. Maylack ordered or provided any of the treatments for Dr. Stynowick that Dr. Neuren would consider necessary under existing medical standards for a person complaining of left lower leg atrophy or weakness.

**Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. Id. at 324. In resisting a properly supported motion for summary judgment, the nonmoving party has an affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

**Analysis**

U.S. Life moves for partial summary judgment on Dr. Stynowick's claim for vexatious refusal to pay. U.S. Life asserts that based on the undisputed facts in this case, U.S. Life had reasonable grounds on which to refuse to pay Dr. Stynowick's claim. U.S. Life argues that it had reasonable cause when it refused to pay Dr. Stynowich's insurance claim because:

> (1) the unambiguous language in the certificate of insurance required Dr. Stynowick to be under the regular care of a physician for the condition causing the disability before being entitled to receive disability benefits;

6

(2) while Dr. Stynowick alleges progressive lower left leg atrophy and weakness beginning in the early 1990s, Dr. Stynowick did not see a physician for nearly two years preceding the date of disability;
(3) the medical records of Dr. Stynowick's physicians make no mention of atrophy, muscle loss, or weakness in Dr. Stynowick's lower left leg; and
(4) there is no evidence that U.S. Life's attitude in reviewing, analyzing or denying Dr. Stynowick's disability claim was in any way vexatious or recalcitrant.

Under section 375.420 of the Revised Statutes of Missouri, a cause of action for vexatious refusal to pay requires that an insurance company "has refused to pay such loss without reasonable cause or excuse." "The law is well-settled that for an insured to obtain a penalty for an insurance company's vexatious refusal to pay a claim, the insured must show that the insurance company's refusal to pay the loss, at the time it was asked to pay, was willful and without reasonable cause or excuse, as the facts would have appeared to a reasonable person before trial." Watters v. Travel Guard Int'l, 136 S.W.3d 100, 108 (Mo.App. E.D. 2004); Groves v. State Farm Mutual Automobile Insurance Company, 540 S.W.2d 39, 42[1] (Mo. banc 1976). "The statute . . . is penal in nature and must be strictly construed." Id. at 109. As such, "[t]here may be no vexatious refusal where the insurer has reasonable cause to believe and does believe there is no liability under its policy and it has a meritorious defense." Id.; see Groves, 540 S.W.2d at 42 ("An insurance company may question and contest an issue of fact relating to its liability if it has reasonable cause to believe, and does believe, that there is no liability under its policy and that it has a meritorious defense.")

Even the existence of a litigable issue does not preclude a vexatious penalty where evidence shows the insurer was vexatious and recalcitrant. DeWitt v. American Family Mutual Insurance Company, 667 S.W.2d 700, 710 (Mo. banc 1984). This language from DeWitt has been characterized as relaxing the burden necessary to support an award of vexatiousness. Russell v. Farmers & Merchants Insurance Company, 834 S.W.2d 209, 221 (Mo. App. S.D.

1992) (citing Allen v. State Farm Mutual Automobile Insurance Company, 753 S.W.2d 616, 620 (Mo. App. 1988); Hester v. American Family Mutual Insurance Company, 733 S.W.2d 1, 2[3] (Mo. App. 1987)). Where there is evidence an insurer unreasonably relied on the results of its own investigation, the question is for the jury. Russell, 834 S.W.2d at 221; Allen, 753 S.W.2d at 621[4].

U.S. Life argues that reasonable jurors could not reach different conclusions on the issue of whether U.S. Life was reasonable in its refusal to pay for the reasons discussed above. Dr. Stynowick argues that in the present case, genuine issues of material fact exist from which a reasonable jury could conclude that U.S. Life's decision to rely upon the investigation of Catherine Schoppee, the Disability RMS claims adjuster, and Dr. Neuren, U.S. Life's expert, was unreasonable.

Ms. Schoppee analyzed Dr. Stynowick's claim and made the final determination to deny his claim. U.S. Life's only involvement in the claim process would have been reviewing Ms. Schoppee's proposed denial letter. In her deposition, Ms. Schoppee testified that when she reviewed Dr. Stynowick's claim, she looked at the period from May 2003 through January 2005 to determine whether Dr. Stynowick was under the regular care and attendance of an attending physician. George Ashmore, Director of Life and Disability Claims for U.S. Life, testified that in analyzing whether Dr. Stynowick was under the regular care and attendance of an attending physician, U.S. Life needed to start with the period for which he was claiming disability, December 2004, and "go from there and see if he was under the regular care and attendance of a treating physician." U.S. Life argues that Ms. Schoppee's analysis included that period of time and was therefore appropriate. However, a reasonable jury could find that considering the time

period prior to the date of disability was unreasonable, and therefore U.S. Life's reliance upon Disability RMS was also unreasonable.

In his deposition, Dr. Neuren admitted that U.S. Life's policy does not specifically define "regular care." Accordingly, a reasonable jury could find that Dr. Stynowick's visits to Dr. Maylack constitute regular care. Dr. Neuren also admitted that the U.S. Life policy does not specifically define the time period to review when making the determination as to whether a particular claimant is under the regular care and attendance of a physician. Dr. Neuren never discussed with either Diagnosis RMS or U.S. Life the appropriate time period to consider when evaluating Dr. Stynowick's claim, and in fact considered the time period from 2003 through 2005 when analyzing the claim. Again, U.S. Life argues that because Dr. Neuren's analysis included that period of time the analysis was appropriate. However, a reasonable jury could find that considering the time period prior to the date of disability was unreasonable, and therefore U.S. Life's reliance upon Disability RMS was also unreasonable.

Dr. Stynowick also notes that U.S. Life's experts came to their conclusions without ever having examined, interviewed, or observed the nature and extent of disability of Dr. Stynowick. A reasonable jury could find that U.S. Life's decision to rely upon Diagnosis RMS without conducting a review of its own or maintaining an oversight of the claims process that would discover that Diagnosis RMS was denying a claim on a basis that was not allegedly in conformance with the insurance policy terms was in bad faith.

I find that material facts remain in dispute. Therefore, summary judgment is inappropriate.

Accordingly

**IT IS HEREBY ORDERED** that Defendant The United States Life Insurance Company in the City of New York's Motion for Partial Summary Judgment [#23] is **DENIED**.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 8th day of November, 2007.